☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA
☐ IN THE COUNTY COURT IN AND FOR DADE COUNTY, FLORIDA

| DIVISION<br>☒ CIVIL<br>☐ CRIMINAL<br>☐ TRAFFIC | **CLERK'S CERTIFICATE** | CASE NUMBER<br>10-53715 CA01 |
|---|---|---|

| PLAINTIFF(S)/PETITIONER(S)<br><br>Amarilis E. Adorno | VS. DEFENDANT(S)/RESPONDENT(S)<br><br>GMAC Mortgage LLC. | CLOCK IN |
|---|---|---|

I, HARVEY RUVIN Clerk of the Circuit and County Court of the Judicial Circuit of Florida, in and for Dade County, DO HEREBY CERTIFY that the foregoing and attached page(s), numbered one to _54 pages_, inclusive, constitute(s) a true and correct copy of the ENTIRE FILE in that certain caused numbered _10-53715 CA 15_ of said Court wherein

_Amarilis E. Adorno_ is/are ☒ Plaintiff(s)/☐ Petitioner(s),

and_GMAC Mortgages LLC._

_____ is/are ☒ Defendant(s)/☐ Respondent(s),

as appears of record in the public files of my Office.

        In Witness Whereof, I have set my hand and affixed the Seal of the said Court at Miami, Dade County, Florida this _29th_ day of _October_, 20_10_.

| HARVEY RUVIN<br>CLERK OF COURTS | BY:<br><br>_Fermecia Berry_<br>DEPUTY CLERK | COURT SEAL |
|---|---|---|

**EXHIBIT A TO NOTICE OF REMOVAL**



# FILE ONLY:

## COMPLAINTS

## AMENDED COMPLAINTS

## COUNTERCLAIMS

## THIRD PARTY COMPLAINTS

## ANSWER
## &
## CROSS CLAIMS

## ON THIS SIDE!!!

☺

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

AMARILIS E. ADORNO,     )    GENERAL JURISDICTION DIVISION

       Plaintiff,    )    CIVIL ACTION NO.: 10 - 53715 CA 15

vs.     )

GMAC MORTGAGE, LLC, a    )
Florida Limited Liability Company,    )

       Defendant.    )

## CIVIL COVER SHEET

### I.   TYPE OF CASE

☐ 001 - Eminent Domain
☒ 003 - Contracts and Indebtedness
☐ 010 - Auto Negligence
☐ 022 - Products Liability
☐ 023 - Condominium
☐ Negligence - Other
☐ 097 - Business Governance
☐ 098 - Business Torts
☐ 099 - Environmental/Toxin Tort
☐ 100 - Third Party Indemnification
☐ 101 - Construction Defect
☐ 102 - Mass Tort
☐ 103 - Negligent Security
☐ 104 - Nursing Home Negligence
☐ 105 - Premises Liability - Commercial
☐ 106 - Premises Liability - Residential
☐ 107 - Negligence - Other
☐ Real Property/Mortgage Foreclosure
☐ 108 - Commercial Foreclosure $0 - $50,000
☐ 109 - Commercial Foreclosure $50,001 - $249,999
☐ 110 - Commercial Foreclosure $250,000 - or more
☐ 111 - Homestead Residential Foreclosure $0 - $50,000
☐ 112 - Homestead Residential Foreclosure $50,001 - $249,999
☐ 113 - Homestead Residential Foreclosure $250,000 or more
☐ 114 - Non-Homestead Residential Foreclosure $0 - $50,000
☐ 115 - Non-Homestead Residential Foreclosure $50,001 - $249,999
☐ 116 - Non-Homestead Residential Foreclosure $250,000 or more
☐ 117 - Other Real Property Actions $0 - $50,000

☐ 118 - Other Real Property Actions $50,001 - $249,999
☐ 119 - Other Real Property Actions $250,000 or more
☐ Professional Malpractice
☐ 094 - Malpractice - Business
☐ 095 - Malpractice - Medical
☐ 096 - Malpractice - Other professional
☐ Other
☐ 120 - Antitrust/Trade Regulation
☐ 121 - Business Transactions
☐ 122 - Constitutional Challenge - Statute or Ordinance
☐ 123 - Constitutional Challenge - Proposed amendment
☐ 124 - Corporate Trust
☐ 125 - Discrimination - Employment or Other
☐ 126 - Insurance Claims
☐ 127 - Intellectual Property
☐ 128 - Libel/Slander
☐ 129 - Shareholder Derivative Action
☐ 130 - Securities Litigation
☐ 131 - Trade Secrets
☐ 132 - Trust Litigation
☐ 133 - Other Civil Complaint
☐ 009 - Bond Estreature
☐ 014 - Replevin
☐ 024 - Witness Protection
☐ 080 - Declaratory Judgment
☐ 081 - Injunctive Relief
☐ 082 - Equitable Relief
☐ 083 - Construction Lien
☐ 084 - Petition for Adversary Preliminary Hearing
☐ 085 - Civil Forfeiture
☐ 086 - Voluntary Binding Arbitration
☐ 087 - Personal Injury Protection (PIP)

**II.   COMPLEX BUSINESS COURT**. This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☐ No☒

**III.   REMEDIES SOUGHT** (check all that apply):
☒ monetary;
☒ non-monetary declaratory or injunctive relief;
☒ punitive

**IV.   NUMBER OF CAUSES OF ACTION: [7]** Count I is an action pursuant to Fl. Stat. § 559.77; Count II is an action for breach of fiduciary duty; Count III is an action for breach of contract; Count IV is an action for unjust enrichment; Count V is an action for conversion; Count VI is an action for fraud; and Count VII is an action for breach of duty to deal squarely and in good faith.

**V.   IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ Yes
☒ No

**VI.   HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒ No
☐ Yes If "Yes", list all related cases by name, case number, and court.

_____

_____

**VII.   IS JURY TRIAL DEMANDED IN COMPLAINT?**
☒ Yes
☐ No

**I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.**

THE LAW OFFICE OF
ADORNO & DAMAS, PL
1000 Brickell Avenue
Suite 1005
Miami, Florida 33131
Tel: (305) 381-9999
Fax: (305) 381-9898

By: _____

Kenneth M. Damas, Esq.
Fla. Bar No.: 0043643

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

AMARILIS E. ADORNO,    )    GENERAL JURISDICTION DIVISION

       Plaintiff,    )    CIVIL ACTION NO.:

    )

vs.    )

    )

GMAC MORTGAGE, LLC, a    )

Florida Limited Liability Company,    )

    )

       Defendant.    )

_____)

## COMPLAINT

**COMES NOW,** the Plaintiff, Amarilis E. Adorno, by and through undersigned counsel,

hereby files this Complaint against the Defendant, GMAC MORTGAGE, LLC, a Florida

Limited Liability Company and in support thereof states the following:

### JURISDICTION, VENUE AND PARTIES

1.    This Court has subject matter jurisdiction over this action, which seeks injunctive relief

and damages in excess of $15,000.00, exclusive of costs and attorney's fees.

2.    Count I is an action pursuant to Fl. Stat. § 559.77.

3.    Count II is an action for breach of fiduciary duty.

4.    Count III is an action for breach of contract.

5.    Count IV is an action for unjust enrichment.

6.    Count V is an action for conversion.

7.    Count VI is an action for fraud.

8.    Count VII is an action for breach of duty to deal squarely and in good faith.

9.    Plaintiff, Amarilis E. Adorno (the "Plaintiff") is over the age of eighteen and is a

resident of Miami-Dade County, Florida.

10.   Defendant, GMAC Mortgage, LLC (the "Defendant") is a limited liability company organized under the laws of the State of Florida.

11.   Venue is proper in Miami-Dade County, Florida as the causes of actions, which forms the basis of this complaint and are set forth fully below, arose out of the mortgage of a property located in Miami-Dade County, Florida.

## FACTUAL ALLEGATIONS

12.   On or about November 29, 2000, Plaintiff together with John Cunill, purchased the home that is in controversy in this case. A true and correct copy of the warranty deed is attached hereto and labeled as **"Exhibit A."**

13.   The home, hereinafter referred to as "the property," is located at 1888 South Miami Avenue, Miami, Florida 33129; its legal description is:

> LOT 12 AND THE NORTHEASTERLY 10 FEET OF LOT 13, IN BLOCK 33, OF HOLLEMAN PARK, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 8, AT PAGE 23, OF THE PUBLIC RECORDS OF MIAMI DADE COUNTY, FLORIDA.

14.   On or about April 20, 2006, Plaintiff refinanced the property with BankUnited, FSB for $492,000.00. A true and correct copy of the mortgage is attached hereto and labeled as **"Exhibit B."**

15.   The mortgage was for a duration of thirty (30) years.

16.   Plaintiff believed that the property insurance on the property was escrowed in the mortgage.

17.   During the interim, BankUnited, FSB was closed down and placed in receivership.

18.   Plaintiff continued making her monthly mortgage payments.

19. On or about May of 2007, Defendant began sending Plaintiff mortgage coupons as Plaintiff's new mortgagee.

20. On or about June of 2007, Defendant placed force insurance on the property, with a payment of $16,965.39.

21. On or about August of 2007, Plaintiff learned of the forced place insurance and quickly obtained her own policy, which cost her approximately $3,000.00.

22. Due to Defendant's action of placing the forced insurance on the property, Plaintiff's mortgage payment increased from $2,008.24 to $3,422.12.

23. Defendant refused to remove the escrow amount, despite Plaintiff obtaining her own insurance policy.

24. The fifty eight percent increase in mortgage payment created an extreme hardship to Plaintiff.

25. On or about April 11, 2008, Plaintiff contacted Defendant for assistance.

26. Due to loan terms, Plaintiff mortgage payments rose again to $4,016.48, double of her original mortgage amount.

27. From April of 2008 to today, Plaintiff continually asked Defendant for some type of assistance with her loan.

28. On or about July of 2009, Defendant placed Plaintiff in a "trial modification plan."

29. The trial modification plan consisted of four (4) monthly installments (July 2009, August 2009, September 2009 and October 2009) in the amount of $3,100.00 per month.

30. Plaintiff paid, timely, the four monthly installments totaling $12,400.00.

31. On or about October 15, 2009, Plaintiff contacted Defendant regarding her loan modification, where Defendant informed Plaintiff that the file is under review and that her new

payments commencing in November 25, 2009 were to be $2,170 for an additional four (4) months (November 2009, December 2009, January 2010 and February 2010). A true an correct copy of the agreement is attached hereto as **"Exhibit C."**

32. Plaintiff paid timely pursuant to the agreement for the months of November 2009, December 2009 and January 2010, totaling an additional $6,510.00.

33. On or about February 19, 2010, Plaintiff attempted to make an automated payment pursuant to her plan, but the payment was rejected.

34. On or about February 19, 2010, Plaintiff contacted Defendant to inform them of the rejected payment and was informed by Defendant not to make the payment as the permanent modification was in process.

35. Plaintiff continued contacting Defendant[1] to follow up on the permanent modification and was informed by Defendant that they are pending the investor(s)' approval.

36. On or about March 22, 2010, Defendant contacted Plaintiff and informed her that they are still pending the investor(s)' approval but asked that she make a payment in the amount of $2,480.00. A true and correct copy of the ledger is attached hereto as **"Exhibit D."**

37. On or about March 23, 2010, Plaintiff made the installment in the amount of $2,480.00.

38. On April 2, 2010, Defendant once again informed Plaintiff that they are still pending the investor(s)' approval but asked that she make another payment in the amount of $2,480.00.

39. On May 3, 2010, Defendant informed Plaintiff that they are still pending the investor(s)' approval, but to call back in thirty (30) days.

40. On June 3, 2010, Plaintiff contacted Defendant and was informed that Plaintiff had to send over a completed 4506T form.

---

[1] Plaintiff contacted Defendant via telephone on March 2, 9, 16 and 19 of 2010.

41. On or about June 3, 2010, Plaintiff sent Defendant the 4506T form via UPS and facsimile.

42. On or about June 7, 2010, Defendant informed Plaintiff that the modification was denied due to Defendant's inability to locate the investor.

43. Pursuant to Defendant's instructions, Plaintiff's modification plan was not solidified due to their inability to find the investors of the loan.

44. As a result of Defendant's failure in locating the investors of Plaintiff's mortgage, Plaintiff was denied a modification.

45. On or about August 31, 2010, Defendant once again placed Plaintiff in a trial modification program, now paying $3,456.99. A true and correct copy of the agreement is attached hereto as **"Exhibit E."**

46. Plaintiff continues to seek assistance from Defendant.

47. Plaintiff has retained the undersigned to represent her in this action.

## COUNT I
## ACTION PURSUANT TO FL. STAT. § 559.77

48. Plaintiff re-alleges and incorporates by reference paragraphs 1 thru 47 as if stated herein and further states as follows:

49. On or about April 20th, 2006, Plaintiff entered into a contractual relationship with BankUnited, FSB for a mortgage on the property.

50. The mortgage was in the amount of $492,000.00 and was to be paid monthly over a period of thirty years. *See* Exhibit B.

51. In the interim, BankUnited FSB went into receivership and Defendant began to claim a right to collect from Plaintiff on said mortgage.

52. On or about July of 2008, Plaintiff ceased making payments to Defendant under the contract, because of interest rate increase and forced place insurance, which resulted in Plaintiff's original monthly mortgage payment of $2,008.24 to $4,016.48.

53. On numerous occasions, Plaintiff notified Defendant of the reason for ceasing to make payments under the mortgage and for not only a loan modification, but for proof from Defendant of being the true mortgagor.

54. Defendant made no written or oral response to Plaintiff's request as the true mortgagor.

55. Despite the fact that Defendant knew that it had no legitimate claim under the loan, Defendant, from about 2007 to the present date, has repeatedly made unlawful demands on Plaintiff for payment on the mortgage and threatened to enforce its claim for payment in violation of Fl. Stat. § 559.72(9).

56. Defendant has used simulated legal and judicial process to coerce payment, by sending collection letter, foreclosure acceleration letters and entering into trial modification agreements, in violation of Fl. Stat. § 559.72(10).

57. Defendant has also harassed Plaintiff at Plaintiff's home and place of employment by willfully communicating with Plaintiff frequently and regularly, in violation of Fl. Stat. § 559.72(7).

58. On information and belief, Plaintiff alleges that Defendant has made numerous false and misleading statements to a credit bureau, to various business associates of Plaintiff, and to Plaintiff's place of employment, orally and in writing, indicating and implying that Plaintiff would not pay Plaintiff's just debts, without any disclosure to the recipients of the statements that the debt was and is disputed by Plaintiff, in violation of Fl. Stat. §§ 559.72(4),(6).

59. The acts of Defendant mentioned above were done and performed willfully, wantonly, and maliciously without regard to their effect on Plaintiff.

60. The acts of Defendant were also in violation of the Truth in Lending Act, United States Code, Title 15, §§ 1601 et seq. and Regulation Z, 12 CFR Part 226.

61. As a direct and proximate result of the conduct and acts of Defendant mentioned above, Plaintiff's excellent credit rating has been impaired, and Plaintiff has suffered severe pain and distress of body and mind, and great mental anguish, embarrassment, humiliation, and shame, all to Plaintiff's damage in the sum of $500,000.00.

62. Plaintiff has been required to employ the undersigned counsel to represent Plaintiff against the willful, wanton, malicious, and wrongful acts of Defendant mentioned above, and have agreed to pay counsel a reasonable attorney fee at an hourly rate of $250.00 per hour.

63. Plaintiff has incurred, and will continue to incur, additional expenses in the prosecution of this law suit, including court costs, telephone calls, travel expenses, and other expenses, all to Plaintiff's further damage.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

a. Defendant to return all monies paid by Plaintiff to Defendant;

b. Defendant be enjoined from any and all further illegal collection practices;

c. For punitive damages;

d. For attorney fees;

e. For costs of suit; and

f. For such other and further relief as the court deems proper.

## COUNT II
## BREACH OF FIDUCIARY DUTY

64. Plaintiff re-alleges and incorporates by reference paragraphs 1 thru 47 as if stated herein and further states as follows:

65. Pursuant to Fla. Stat. § 658.12 (8) "Fiduciary" means a trustee; committee, guardian, custodian, conservator, or other personal representative of a person, property, or an estate; registrar or transfer agent of, or in connection with, evidences of indebtedness of every kind and of stocks and bonds and other securities; fiscal or financial agent; investment adviser; receiver; trustee in bankruptcy; assignee for creditors; or holder of any similar representative position or any other position of trust, including a person acting in any or all the capacities and performing any or all the functions enumerated in s. 660.34.

66. As such, Defendant owed Plaintiff a duty to act in good faith and in the best interest of homeowner by providing homeowner with special troubled loan servicing.

67. To date, Defendant has failed to provide Plaintiff with a copy of said papers.

68. On or about July of 2009, Defendant placed Plaintiff in a "trial modification" without having settlement authority

69. The trial modification plan consisted of four (4) monthly installments (July 2009, August 2009, September 2009 and October 2009) in the amount of $3,100.00 per month.

70. Plaintiff paid, timely, the four monthly installments totaling $12,400.00.

71. On or about October 15, 2009, Plaintiff contacted Defendant regarding her loan modification, where Defendant informed Plaintiff that the file is under review and that her new payments commencing in November 25, 2009 were to be $2,170 for an additional four (4) months (November 2009, December 2009, January 2010 and February 2010). *See* Exhibit C.

Plaintiff paid timely pursuant to the agreement for the months of November 2009, December 2009 and January 2010, totaling an additional $6,510.00.

72. On or about February 19, 2010, Plaintiff attempted to make an automated payment pursuant to her plan, but the payment was rejected.

73. On or about February 19, 2010, Plaintiff contacted Defendant to inform them of the rejected payment and was informed by Defendant not to make the payment as the permanent modification was in process.

74. Plaintiff continued contacting Defendant[2] to follow up on the permanent modification and was informed by Defendant that they are pending the investor(s)' approval.

75. On or about March 22, 2010, Defendant contacted Plaintiff and informed her that they are still pending the investor(s)' approval but asked that she make a payment in the amount of $2,480.00. *See* Exhibit D.

76. On or about March 23, 2010, Plaintiff made the installment in the amount of $2,480.00.

77. On April 2, 2010, Defendant once again informed Plaintiff that they are still pending the investor(s)' approval but asked that she make another payment in the amount of $2,480.00.

78. On May 3, 2010, Defendant informed Plaintiff that they are still pending the investor(s)' approval, but to call back in thirty (30) days.

79. On June 3, 2010, Plaintiff contacted Defendant and was informed that Plaintiff had to send over a completed 4506T form.

80. On or about June 3, 2010, Plaintiff sent Defendant the 4506T form via UPS and facsimile.

---

[2] Plaintiff contacted Defendant via telephone on March 2, 9, 16 and 19 of 2010.

81. On or about June 7, 2010, Defendant informed Plaintiff that the modification was denied due to Defendant's inability to locate the investor.

82. Plaintiff complied with all payments of the trial modification plan.

83. Pursuant to Defendant's instructions, Plaintiff's modification plan was not solidified due to their inability to find the investors of the loan.

84. As a direct result of Defendant's failure in locating the investors of Plaintiff's mortgage, Plaintiff was denied a modification.

85. Defendant was fully aware or should have been aware that they did not have settlement authority to modify Plaintiff's mortgage.

86. As a result, Plaintiff did not receive a modification, is unable to pay her mortgage payment and has suffered irreparable harm to her credit.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

    a.  Defendant to return all monies paid by Plaintiff to Defendant;

    b.  Defendant be enjoined from any and all further illegal collection practices;

    c.  For punitive damages;

    d.  For attorney fees;

    e.  For costs of suit; and

    f.  For such other and further relief as the court deems proper.

### COUNT III
### BREACH OF CONTRACT

87. Plaintiff re-alleges and incorporates by reference paragraphs 1 thru 47 as if stated herein and further states as follows:

BankUnited, FSB for a mortgage on the property.

89.  In the interim, BankUnited, FSB went into receivership and Defendant began to claim a right to collect from Plaintiff on said mortgage.

90.  For over three years since Defendant claimed a right to collect on said mortgage, Plaintiff has continually demanded for a copy of her closing package and transfer papers between BankUnited, FSB and Defendant.

91.  Pursuant to paragraph seventeen (17) of the mortgage titled "Borrower's copy"— "Borrower shall be given one copy of the Note and of this Security Instrument."

92.  To date, Defendant has failed to provide Plaintiff with a copy of said papers.

93.  Defendant has also failed to secure the investors to approve Plaintiff's loan modification.

94.  Defendant has acknowledged not having settlement authority for said loan.

95.  Defendant has also acknowledged an inability to reach the investors of the mortgage.

96.  Given Defendant's inability to locate the investor, Defendant does not have settlement authority on said mortgage.

97.  Without settlement authority, Defendant is unable to modify Plaintiff's loan or in the event that Plaintiff pays off the "alleged mortgage," provide Plaintiff with a satisfaction.

98.  Likewise Defendant will not be able to comply with the foreclosure prevention loan servicing requirement imposed on Defendant pursuant to the National Housing Act , 12 U.S.C. 1701x (c) (5) which requires all private lenders servicing non-federally insured home loans, including the Defendant, to advise borrowers, including this separate Plaintiff, of any home ownership counseling Defendant offers together with information about counseling offered by

the U.S. Department of Housing and Urban Development.

99. Pursuant to paragraph twenty three (23) of the mortgage titled "Release," "upon payment of all sums secured by this security Instrument, Lender shall release this Security Instrument."

100. A lender is not entitled to maintain a foreclosure action or collect on a mortgage if it does not own and hold the note which is purportedly secured by the subject mortgage. Your Construction Center, Inc. v. Gross, 316 So.2d 596 (Fla. 4th DCA 1975).

101. As a result, Defendant breached the terms of the mortgage by not providing Plaintiff with the a copy of the mortgage and note as well as not having authority to either modify the terms of the mortgage or provide a satisfaction.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

    a.  Defendant to return all monies paid by Plaintiff to Defendant;

    b.  Defendant be enjoined from any and all further illegal collection practices;

    c.  For punitive damages;

    d.  For attorney fees;

    e.  For costs of suit; and

    f.  For such other and further relief as the court deems proper.

## COUNT IV
## UNJUST ENRICHMENT

102. Plaintiff re-alleges and incorporates by reference paragraphs 1 thru 47 as if stated herein and further states as follows:

103. On or about April 20th, 2006, Plaintiff entered into a contractual relationship with BankUnited FSB for a mortgage on the property.

104. In the interim, BankUnited, FSB went into receivership and Defendant began to claim a right to collect from Plaintiff on said mortgage.

105. For over three years since Defendant claimed a right to collect on said mortgage, Plaintiff has continually demanded for a copy of her closing package and transfer papers between BankUnited, FSB and Defendant.

106. To date, Defendant has failed to provide Plaintiff with a copy of said papers.

107. On or about July of 2009, Defendant placed Plaintiff in a "trial modification" without having settlement authority

108. The trial modification plan consisted of four (4) monthly installments (July 2009, August 2009, September 2009 and October 2009) in the amount of $3,100.00 per month.

109. Plaintiff paid, timely, the four monthly installments totaling $12,400.00.

110. On or about October 15, 2009, Plaintiff contacted Defendant regarding her loan modification, where Defendant informed Plaintiff that the file is under review and that her new payments commencing in November 25, 2009 were to be $2,170 for an additional four (4) months (November 2009, December 2009, January 2010 and February 2010). *See* Exhibit C. Plaintiff paid timely pursuant to the agreement for the months of November 2009, December 2009 and January 2010, totaling an additional $6,510.00.

111. On or about February 19, 2010, Plaintiff attempted to make an automated payment pursuant to her plan, but the payment was rejected.

112. On or about February 19, 2010, Plaintiff contacted Defendant to inform them of the rejected payment and was informed by Defendant not to make the payment as the permanent modification was in process.

113. Plaintiff continued contacting Defendant[3] to follow up on the permanent modification and was informed by Defendant that they are pending the investor(s)' approval.

114. On or about March 22, 2010, Defendant contacted Plaintiff and informed her that they are still pending the investor(s)' approval but asked that she make a payment in the amount of $2,480.00. *See* Exhibit D.

115. On or about March 23, 2010, Plaintiff made the installment in the amount of $2,480.00.

116. On April 2, 2010, Defendant once again informed Plaintiff that they are still pending the investor(s)' approval but asked that she make another payment in the amount of $2,480.00.

117. On May 3, 2010, Defendant informed Plaintiff that they are still pending the investor(s)' approval, but to call back in thirty (30) days.

118. On June 3, 2010, Plaintiff contacted Defendant and was informed that Plaintiff had to send over a completed 4506T form.

119. On or about June 3, 2010, Plaintiff sent Defendant the 4506T form via UPS and facsimile.

120. On or about June 7, 2010, Defendant informed Plaintiff that the modification was denied due to Defendant's inability to locate the investor.

121. Plaintiff complied with all payments of the trial modification plan totaling $27,326.99.

122. Pursuant to Defendant's instructions, Plaintiff's modification plan was not solidified due to Defendant's inability to find the investors of the loan.

123. As a direct result of Defendant's failure in locating the investors of Plaintiff's mortgage, Plaintiff was denied a modification.

---

[3] Plaintiff contacted Defendant via telephone on March 2, 9, 16 and 19 of 2010.

124. Defendant was fully aware or should have been aware that they did not have settlement authority to modify Plaintiff's mortgage.

125. Despite such knowledge, however, Defendant continued to collect from Plaintiff the mortgage payments.

126. As a result, Defendant is currently in possession of mortgage installments which they are not entitled to.

127. As such, Plaintiff has been denied monies which she is legally entitled to.

128. Under these circumstances, it would be inequitable for the Defendant to retain said money legally belonging to Plaintiff.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

    a.   Defendant to return all monies paid by Plaintiff to Defendant;

    b.   Defendant be enjoined from any and all further illegal collection practices;

    c.   For punitive damages;

    d.   For attorney fees;

    e.   For costs of suit; and

    f.   For such other and further relief as the court deems proper.

**COUNT V**
**CONVERSION**

129. Plaintiff re-alleges and incorporates by reference paragraphs 1 thru 47 as if stated herein and further states as follows:

130. On or about April 20th, 2006, Plaintiff entered into a contractual relationship with BankUnited, FSB for a mortgage on the property.

131. In the interim, BankUnited, FSB went into receivership and Defendant began to claim a right to collect from Plaintiff on said mortgage.

132. For over three years since Defendant claimed a right to collect on said mortgage, Plaintiff has continually demanded for a copy of her closing package and transfer papers between BankUnited FSB and Defendant.

133. To date, Defendant has failed to provide Plaintiff with a copy of said papers.

134. Since 2007 Defendant received mortgage payments from Plaintiff that they were not entitled to.

135. Defendant remains in possession of this money.

136. As a result, Plaintiff has been deprived of said monies.

137. Defendant has converted to Defendant's own use the said money tender by Plaintiff.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

a. Defendant to return all monies paid by Plaintiff to Defendant;

b. Defendant be enjoined from any and all further illegal collection practices;

c. For punitive damages;

d. For attorney fees;

e. For costs of suit; and

f. For such other and further relief as the court deems proper.

### COUNT VI
### FRAUD

138. Plaintiff re-alleges and incorporates by reference paragraphs 1 thru 47 as if stated herein and further states as follows:

139. On or about April 20th, 2006, Plaintiff entered into a contractual relationship with BankUnited, FSB for a mortgage on the property.

140. In the interim, BankUnited, FSB went into receivership and Defendant began to claim a right to collect from Plaintiff on said mortgage.

141. For over three years since Defendant claimed a right to collect on said mortgage, Plaintiff has continually demanded for a copy of her closing package and transfer papers between BankUnited FSB and Defendant.

142. To date, Defendant has failed to provide Plaintiff with a copy of said papers.

143. On or about July of 2009, Defendant placed Plaintiff in a "trial modification" without having settlement authority.

144. The trial modification plan consisted of four (4) monthly installments (July 2009, August 2009, September 2009 and October 2009) in the amount of $3,100.00 per month.

145. Plaintiff paid, timely, the four monthly installments totaling $12,400.00.

146. On or about October 15, 2009, Plaintiff contacted Defendant regarding her loan modification, where Defendant informed Plaintiff that the file is under review and that her new payments commencing in November 25, 2009 were to be $2,170 for an additional four (4) months (November 2009, December 2009, January 2010 and February 2010). *See* Exhibit C. Plaintiff paid timely pursuant to the agreement for the months of November 2009, December 2009 and January 2010, totaling an additional $6,510.00.

147. On or about February 19, 2010, Plaintiff attempted to make an automated payment pursuant to her plan, but the payment was rejected.

rejected payment and was informed by Defendant not to make the payment as the permanent modification was in process.

149. Plaintiff continued contacting Defendant[4] to follow up on the permanent modification and was informed by Defendant that they are pending the investor(s)' approval.

150. On or about March 22, 2010, Defendant contacted Plaintiff and informed her that they are still pending the investor(s)' approval but asked that she make a payment in the amount of $2,480.00. *See* Exhibit D.

151. On or about March 23, 2010, Plaintiff made the installment in the amount of $2,480.00.

152. On April 2, 2010, Defendant once again informed Plaintiff that they are still pending the investor(s)' approval but asked that she make another payment in the amount of $2,480.00.

153. On May 3, 2010, Defendant informed Plaintiff that they are still pending the investor(s)' approval, but to call back in thirty (30) days.

154. On June 3, 2010, Plaintiff contacted Defendant and was informed that Plaintiff had to send over a completed 4506T form.

155. On or about June 3, 2010, Plaintiff sent Defendant the 4506T form via UPS and facsimile.

156. On or about June 7, 2010, Defendant informed Plaintiff that the modification was denied due to Defendant's inability to locate the investor.

157. Plaintiff complied with all payments of the trial modification plan totaling $27,326.99.

158. Defendant was unable to grant Plaintiff a modification due to Defendant's inability to locate the investors of the loan.

---

[4] Plaintiff contacted Defendant via telephone on March 2, 9, 16 and 19 of 2010.

the mortgage and/or had settlement authority to conclude the Plaintiff's loan modification, since they could not located neither the loan package nor the investors.

160. As such, Defendant intended to induce Plaintiff to rely and act upon the misrepresentation.

161. Plaintiff justifiably and reasonably relied upon the misrepresentation in paying her regular mortgage payments as well as those required under the "trial modification plan."

162. As a result of this misrepresentation, Defendant received monies that were not due to them.

163. The trial modification agreement made by Defendant was known by the Defendant to be false since the Defendant had no settlement authority to solidify said modification.

164. Plaintiff was injured as a direct, proximate, and foreseeable result of its reliance on Defendants' misrepresentations.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

a. Defendant to return all monies paid by Plaintiff to Defendant;

b. Defendant be enjoined from any and all further illegal collection practices;

c. For punitive damages;

d. For attorney fees;

e. For costs of suit; and

f. For such other and further relief as the court deems proper.

165. Plaintiff re-alleges and incorporates by reference paragraphs 1 thru 47 as if stated herein and further states as follows:

166. On or about April 20th, 2006, Plaintiff entered into a contractual relationship with BankUnited, FSB for a mortgage on the property.

167. In the interim, BankUnited, FSB went into receivership and Defendant began to claim a right to collect from Plaintiff on said mortgage.

168. A lender is not entitled to maintain a foreclosure action or collect on a mortgage if it does not own and hold the note which is purportedly secured by the subject mortgage. Your Construction Center, Inc. v. Gross, 316 So.2d 596 (Fla. 4th DCA 1975).

169. For over three years since Defendant claimed a right to collect on said mortgage, Plaintiff has continually demanded for a copy of her closing package and transfer papers between BankUnited FSB and Defendant.

170. To date, Defendant has failed to provide Plaintiff with a copy of said papers.

171. On or about July of 2009, Defendant placed Plaintiff in a "trial modification" without having settlement authority

172. The trial modification plan consisted of four (4) monthly installments (July 2009, August 2009, September 2009 and October 2009) in the amount of $3,100.00 per month.

173. Plaintiff paid, timely, the four monthly installments totaling $12,400.00.

174. On or about October 15, 2009, Plaintiff contacted Defendant regarding her loan modification, where Defendant informed Plaintiff that the file is under review and that her new payments commencing in November 25, 2009 were to be $2,170 for an additional four (4)

months (November 2009, December 2009, January 2010 and February 2010). *See* Exhibit C. Plaintiff paid timely pursuant to the agreement for the months of November 2009, December 2009 and January 2010, totaling an additional $6,510.00.

175.On or about February 19, 2010, Plaintiff attempted to make an automated payment pursuant to her plan, but the payment was rejected.

176.On or about February 19, 2010, Plaintiff contacted Defendant to inform them of the rejected payment and was informed by Defendant not to make the payment as the permanent modification was in process.

177.Plaintiff continued contacting Defendant[5] to follow up on the permanent modification and was informed by Defendant that they are pending the investor(s)' approval.

178.On or about March 22, 2010, Defendant contacted Plaintiff and informed her that they are still pending the investor(s)' approval but asked that she make a payment in the amount of $2,480.00. *See* Exhibit D.

179.On or about March 23, 2010, Plaintiff made the installment in the amount of $2,480.00.

180.On April 2, 2010, Defendant once again informed Plaintiff that they are still pending the investor(s)' approval but asked that she make another payment in the amount of $2,480.00.

181.On May 3, 2010, Defendant informed Plaintiff that they are still pending the investor(s)' approval, but to call back in thirty (30) days.

182.On June 3, 2010, Plaintiff contacted Defendant and was informed that Plaintiff had to send over a completed 4506T form.

183.On or about June 3, 2010, Plaintiff sent Defendant the 4506T form via UPS and facsimile.

---

[5] Plaintiff contacted Defendant via telephone on March 2, 9, 16 and 19 of 2010.

185. Plaintiff complied with all payments of the trial modification plan totaling $27,826.99.

186. Pursuant to Defendant's instructions, Plaintiff's modification plan was not solidified due to their inability to find the investors of the loan.

187. As a direct result of Defendant's failure in locating the investors of Plaintiff's mortgage, Plaintiff was denied a modification.

188. Defendant was fully aware or should have been aware that they did not have settlement authority to modify Plaintiff's mortgage.

189. As a result, Plaintiff did not receive a modification, is unable to pay her mortgage payment and has suffered irreparable harm to her credit.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

a. Defendant to return all monies paid by Plaintiff to Defendant;

b. Defendant be enjoined from any and all further illegal collection practices;

c. For punitive damages;

d. For attorney fees;

e. For costs of suit; and

f. For such other and further relief as the court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Amarilis E. Adorno hereby demands trial by jury on all issues so triable.

Respectfully submitted this ___ day of October, 2010.

THE LAW OFFICE OF
ADORNO & DAMAS, PL
1000 Brickell Avenue
Suite 1005
Miami, Florida 33131
Tel: (305) 381-9999
Fax: (305) 381-9898

By:

Kenneth M. Damas, Esq.
Fla. Bar No.: 0043643
*Attorney for Plaintiff*

PREPARED BY AND
RETURN TO

WARRANTY DEED
(00-10-100)

REF: 19399040460

TRANSCONTINENTAL TITLE COMPANY
8725 N.W. 18TH TERRACE, SUITE 200
MIAMI, FLORIDA 33172
FILE NO. *MI20947*
TAX NO.: *01-4138-001-4640

00R588290 2000 DEC 07 11:19

DOCSTPDEE 1,800.00 SURTX      0.00
HARVEY RUVIN,  CLERK DADE COUNTY, FL

## THIS WARRANTY DEED, Made the 29TH, day of NOVEMBER, 2000 by,

JOSE M VIDAURRE AND MARIA VIDAURRE, HUSBAND AND WIFE

HEREINAFTER CALLED THE GRANTOR, TO

AMARILIS ADORNO, A SINGLE WOMAN AND JOHN M CUNILL, A SINGLE MAN

HEREINAFTER CALLED THE GRANTEE.

Whose address is: 1888 SOUTH MIAMI AVE, MIAMI FL 33129

Buyer(s) Social Security Number(s) _____
(WHEREVER USED HEREIN THE TERMS "GRANTOR" AND "GRANTEE" INCLUDE ALL OF THE PARTIES TO THIS
INSTRUMENT AND THE HEIRS, LEGAL REPRESENTATIVES, AND ASSIGNS OF INDIVIDUALS AND THE SUCCESSORS
AND ASSIGNS OF CORPORATIONS, WHEREVER THE CONTEXT SO ADMITS OR REQUIRES.)

**WITNESSED,** that the Grantor, for and in consideration of the sum of ten and no/100, and other valuable considerations, receipt
whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remiss, releases, conveys and confirms unto the Grantee all
that certain land, situate in County of *DADE*, State of Florida, viz:

LOT 12 AND THE NORTHEASTERLY 10 FEET OF LOT 13, IN BLOCK 33, OF HOLLEMAN PARK, ACCORDING TO
THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 8, PAGE 23, OF THE PUBLIC RECORDS OF DADE COUNTY,
FLORIDA.

**TOGETHER,** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.
**TO HAVE AND TO HOLD,** the same in fee simple forever.
AND the Grantor hereby covenants with said grantee that the Grantor is lawfully seized of said land in fee simple; that the Grantor has
good right and lawful authority to sell and convey said land, and hereby warrants the title to said land and will defend the same against
the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to
December 31, 1999.

**IN WITNESS WHEREOF,** the said Grantor has signed and sealed these presents the day and year first above written.

SIGNED SEALED AND DELIVERED IN THE PRESENCE OF:

WITNESS SIGNATURE

JOSE M VIDAURRE

PRINTED NAME (WITNESS)

ANA MARIA VIDAURRE

WITNESS SIGNATURE

GREG SCHREIBER
PRINTED NAME (WITNESS)

STATE OF FLORIDA

COUNTY OF DADE

RECORDED IN OFFICIAL RECORDS BOOK
OF DADE COUNTY, FLORIDA
RECORD VERIFIED
**HARVEY RUVIN**
CLERK CIRCUIT COURT

The foregoing instrument was acknowledged before me this 29TH day of NOVEMBER, 2000 by JOSE
M VIDAURRE, A SINGLE MAN AND ANA MARIA VIDAURRE who/are is personally known to me or who
has/have produced a drivers license(s) as identification and who did not take an oath.

NOTARY PUBLIC
(SEAL)

GREG SCHREIBER
(printed name)

EXHIBIT

A

Name: **ANA ELIES**

Address: **BANKUNITED, FSB**
**7815 NW 148 ST, MIAMI LAKES, FL 33016**

DR BK 24910 PGs 0464 - 480; (17pgs)
RECORDED 05/10/2006 13:27:40
MTG DOC TAX 1,722.00
INTANG TAX 984.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Return to:

**BANKUNITED, FSB**
**ATTN: POST CLOSING**
**7815 NW 148 STREET**
**MIAMI LAKES, FL  33016**

06,229

[Space Above This Line For Recording Data]

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  **"Security Instrument"** means this document, which is dated **April 20, 2006**                              , together with all Riders to this document.
(B)  **"Borrower"** is **AMARILIS E ADORNO, A MARRIED WOMAN**

Borrower is the mortgagor under this Security Instrument.
(C)  **"Lender"** is BankUnited, FSB
Lender is a **CORPORATION**
the laws of **UNITED STATES OF AMERICA**                           organized and existing under
7815 NW 148 STREET, MIAMI LAKES, Florida  33016                         . Lender's address is

                                                    . Lender is the mortgagee under this Security Instrument.
(D)  **"Note"** means the promissory note signed by Borrower and dated **April 20, 2006**                 . The Note
states that Borrower owes Lender **Four Hundred Ninety Two Thousand and no/100**
Dollars (U.S. **$492,000.00**                     ) plus interest. Borrower has promised
to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 01, 2036**
(E)  **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(F)  **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G)  **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider          [ ] Condominium Rider              [ ] Second Home Rider

[ ] Balloon Rider                  [ ] Planned Unit Development Rider  [ ] Other(s) [specify]

[X] 1-4 Family Rider               [ ] Biweekly Payment Rider

**FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L1 (0011)
**MFFL3112**                      *(Page 1 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
**000476251-4**

EXHIBIT
B

(H) "Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

COUNTY of MIAMI-DADE
[Type of Recording Jurisdiction]    [Name of Recording Jurisdiction]

LOT 12 AND THE NORTHEASTERLY 10 FEET OF LOT 13, IN BLOCK 33, OF HOLLEMAN PARK, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 8, AT PAGE 23, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA

which currently has the address of     1888 SOUTH MIAMI AVENUE
                                        [Street]

MIAMI            , Florida    33129            ("Property Address"):
[City]                        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L2 (0011)
MFFL3112                    (Page 2 of 11 pages)

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
000476251-4

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L3 (0011)
MFFL3112

*(Page 3 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
000476251-4

Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may

**FLORIDA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L4 (0011)
**MFFL3112**

*(Page 4 of 11 pages)*

Form 3010 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
**000476251-4**

require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may

FLORIDA—Single Family—Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

ITEM 1615L5 (0011)
**MFFL3112**

*(Page 5 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131
**000476251-4**

disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.   Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.   Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

**FLORIDA**—Single Family—Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

ITEM 1615L6 (0011)
**MFFL3112**

*(Page 6 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

000476251-4

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this

**FLORIDA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L7 (0011)
**MFFL3112**

*(Page 7 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
**000476251-4**

Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.  Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.  Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**FLORIDA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L8 (0011)
MFFL3112

*(Page 8 of 11 pages)*

Form 3010 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
**000476251-4**

**16.   Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.   Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18.   Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.   Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.   Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the

**FLORIDA**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1615L9 (0011)
**MFFL3112**

*(Page 9 of 11 pages)*

Form 3010 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
**000476251-4**

other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.  Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22.  Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23.  Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24.  Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25.  Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L10 (0011)
**MFFL3112**

*(Page 10 of 11 pages)*

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
**000476251-4**

Book24510/Page473    CFN#20060505260

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 11 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)　　　　_____ (Seal)
AMARILIS E. ADORNO　　　　-Borrower　　　　　　　　　　　　　　　　-Borrower

_____ (Seal)　　　　_____ (Seal)
　　　　　　　　　　　　　　-Borrower　　　　　　　　　　　　　　　　-Borrower

_____ (Seal)　　　　_____ (Seal)
　　　　　　　　　　　　　　-Borrower　　　　　　　　　　　　　　　　-Borrower

Signed, sealed and delivered in the presence of:

_____
JOSE SOTOCONGO

_____
Avie Izquierd

State of Florida
County of MIAMI-DADE

The foregoing instrument was acknowledged before me this 20 day of April, 2006 by

Amarilis E. Adorno, A married women

who is personally known to me or who has produced

F1 DC

as identification.

_____
Notary Public

JOSE SOTOLONGO
Comm# DD0413621
Expires 3/31/2009
Bonded thru (800)432-4254
Florida Notary Assn., Inc.

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1615L11 (0011)
MFFL3112

(Page 11 of 11 pages)

Form 3010 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
000476251-4